In re C–L CARTAGE CO., INC., Debtor.

Thomas E. RAY, Trustee, Plaintiff,

v.

CITY BANK & TRUST COMPANY, Defendant.

Bankruptcy No. 1–84–00334.
Adv. No. 1–85–0036.

United States Bankruptcy Court, E.D. Tennessee.

March 11, 1987.

Harold L. North, Jr. of Ray & North, Chattanooga, Tenn., for plaintiff.

B. Timothy Pirtle, McMinnville, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

The question before the court is whether the trustee in bankruptcy in the case of C–L Cartage Company can recover payments it made to the defendant, City Bank, within a year before bankruptcy. The trustee contends that the payments are recoverable as preferential or fraudulent transfers.

The debtor, C–L Cartage Company, was a corporation. At all the relevant times, its president was Carlos Foster. C–L Cartage filed a petition in bankruptcy, for reorganization under chapter 11 of the Bankruptcy Code, on March 2, 1984. In December, 1984, the case was converted to a liquidation case under chapter 7 of the code, and the trustee was appointed.

In March, 1983, less than a year before C–L Cartage's bankruptcy, Carlos Foster had obtained a personal loan of $30,000 from City Bank. He put the money into C–L Cartage as operating capital. There was no proof that C–L Cartage gave Carlos Foster a promissory note for repayment of the money as a loan or that C–L Cartage carried the transaction on its books as a loan from Carlos Foster.

Carlos Foster's mother co-signed the note to City Bank. She also pledged as security for the debt three certificates of deposit (CD's). Two of the CD's were for $10,000 each, and the third was for $11,379.98.

In December, 1983, Carlos Foster obtained another personal loan from City Bank in the amount of about $20,000. He again put the money into C–L Cartage. There was no proof that C–L Cartage carried the $20,000 on its books as a loan or executed a note for repayment to Carlos Foster. Carlos Foster's mother again co-signed his note to City Bank. The note says it is secured by a $10,000 CD and two trucks.

Apparently there was not a fourth $10,000 CD that secured the second note in addition to the three CD's that secured the earlier $30,000 note.

Each note contains a typical cross-collateral clause that is intended to make its collateral secure all other debts to the bank. The clause in each note is preceded by a box that apparently was supposed to be checked if the clause applied, but it was not checked in either note, as far as the court can tell from the copies in the file.

City Bank did not prove that it had a security interest noted on the title certificate to either of the trucks that supposedly secured the second note. Carlos Foster thought the bank had the title certificates but he didn't recall ever seeing them. The bank vice-president who handled the loans was positive the bank had its security interests noted on the title certificates. He testified that in the normal course the title certificates with the lien releases executed would have been returned to Carlos Foster or C–L Cartage after Carlos Foster's mother paid the debts during C–L Cartage's chapter 11. However, the bank didn't have any proof that this actually happened. The trustee eventually sold the trucks at auction. The court gave the bank time after the trial to submit any more evidence it could find as to what exactly happened with the title certificates. The bank did not submit any evidence within the time allowed.

Carlos Foster testified that he wanted the loans made directly to C–L Cartage, but the bank refused. The bank vice-president testified that C–L Cartage did not submit written loan applications. He also testified that neither Carlos Foster nor C–L Cartage was a customer of City Bank, but

Carlos Foster's mother was a customer and the loans were made on the strength of her CD's as collateral and her co-signature of the notes.

On the $30,000 note, there were eleven monthly payments of $1,399.31 each made before C–L Cartage's bankruptcy. They were made from April, 1983 through February, 1984. C–L Cartage made six payments by checks payable to City Bank. It made three more payments by checks payable to Carlos Foster's mother who endorsed the checks over to the bank (Aug., Sept. & Nov. 1983). The trustee seeks to recover these nine monthly payments. The trustee does not seek to recover the other two pre-bankruptcy payments (July, 1983 and February, 1984) because C–L Cartage apparently did not make the payments.

For the same reason, the trustee does not seek to recover two monthly payments made in March, 1984.

In May, 1984, Carlos Foster's mother paid the debt in full. The bulk of the payment was $17,231.93. There were other payments or credits of $311.58 and $5.20.

There were two monthly payments of $957.45 each made on the $20,000 note. They were made in January and March, 1984. The trustee seeks to recover only the January payment. The March payment was not made by C–L Cartage.

In May, Carlos Foster's mother paid the debt—the bulk of the payment being $18,651.84. Other payments or credit totaled $546.44.

The parties apparently intended stipulation number 7 to mean that C–L Cartage was insolvent at all the relevant times.

From a review of the debtor's federal income tax returns for 1982, 1983, and 1984, in addition to the debtor's financial statement as of December 31, 1984, the accountant for the Trustee, James L. Jackson, has determined and is of the opinion, that the debtor was insolvent at the time of the transfers set out above. At the trial Carlos Foster was asked about various documents showing C–L Cartage to have been insolvent when the payments were made. He did not dispute their accuracy.

### Discussion

■ Carlos Foster's contribution of the borrowed money to C–L Cartage, the debtor, made him a creditor. *In re Fulghum Construction Corp.*, 7 B.R. 629 (Bankr.M. D.Tenn.1980). Carlos Foster intended that the debtor would repay his loan debts to the bank. This was essentially the same as intending that the debtor would repay him for putting the borrowed money into the debtor.

Since Carlos Foster was a creditor of the debtor, its payments on his debt to the bank may have preferred him over other creditors. Likewise, the debtor's payments may have preferred Carlos Foster's mother as co-signer of his note to the bank and pledgor of the CD's.

Carlos Foster and his mother had unsecured, non-priority claims against the debtor. As a general rule, proof that the debtor was insolvent at the time of bankruptcy proves that pre-bankruptcy payments on an unsecured non-priority claim were preferential under Bankruptcy Code § 547(b)(5). V. Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand.L.Rev. 713, 735–39 (1985). The evidence is not clear, but sufficiently leads to the conclusion that the debtor was insolvent at the time of bankruptcy. Thus, the debtor's payments to the bank preferred Carlos Foster and his mother.

■ This is true even though the debt to the bank was secured by the CD's pledged by Carlos Foster's mother. Since the CD's were not the debtor's property, the usual reason for holding that payments on a fully secured claim are not preferential does not apply. *In re Herman Cantor Construction Co.*, 15 B.R. 747, 8 Bankr.Ct.Dec. 516 (Bankr.E.D.Va.1981). Furthermore, for the reasons set out below, the court concludes that the debts were not fully secured.

■ Since the bank's security interest in the two trucks was unperfected at the

time of bankruptcy, it was avoidable by the trustee and the court can treat the second loan as not secured by the trucks. 11 U.S.C. § 544(a); Tenn.Code Ann. §§ 47-9-301(1)(b) & (3) & 47-9-302(3); *In re Custom Caps, Inc.*, 1 B.R. 99 (Bankr.E.D.Tenn. 1979); *United States v. Air Florida, Inc.*, 56 B.R. 732 (S.D.Fla.1985) (creditor with unperfected security interest treated as unsecured with regard to alleged preferential payments). This means that the three CD's were the only security for both loans. The evidence shows that at the time of bankruptcy it would have taken more than $35,000 to pay off both loans. This was more than the amount of the CD's. The bank's vice-president also testified that the CD's were not enough to pay both debts. The debtor's payments on either loan reduced the unsecured amount for which Carlos Foster and his mother were liable to the bank. Thus, the debtor's payments were clearly preferential to Carlos Foster and his mother.

The bank could argue that the trustee can *not* recover from it because it was not a creditor and therefore could not be preferred. 11 U.S.C. § 547(b)(1). The payments to the bank are avoidable because they were preferential to Carlos Foster and his mother. 11 U.S.C. § 547(b)(1) ("for the benefit of"). The Bankruptcy Code separates the avoidance of transfers from the trustee's right to recover. The critical issue is whether the trustee can recover from the non-creditor bank that received payments.

■ Section 550(a)(1) says that the trustee can recover an avoided preferential transfer from the initial transferee or the entity for whose benefit the transfer was made. 11 U.S.C. § 550(a)(1). It does not say that the initial transferee must have been a creditor or a preferred creditor. Section 550 also does not give the initial transferee the defenses available to a subsequent transferee. 11 U.S.C. § 550(a)(2) & (b). Thus, it appears that the trustee can recover from the bank as the initial transferee even if it was not a preferred creditor. See *In re Auto-Pak, Inc.*, 55 B.R. 403 (Bankr.D.D.C.1985).

The courts have had a difficult time with cases like this. In one case, a corporation had been denied further credit by one of its potato suppliers. The owner of the business's land bought potatoes from the supplier on his own credit and transferred them to the corporation, which later made payments on the debt directly to the supplier. The corporation went into bankruptcy. The court held that the corporation's payments to the supplier could not be recovered from the supplier as preferences because it was not a creditor of the corporation. The court also denied recovery of the payments as fraudulent transfers because the corporation actually received the benefit, the potatoes, that gave rise to the debt and the payments. *In re Evans Potato Company, Inc.*, 44 B.R. 191, 12 Bankr.Ct. Dec. 518 (Bankr.N.D.Ohio 1984).

Other courts in similar situations have held that the corporate debtor's transfers are recoverable as fraudulent transfers if they are not recoverable as preferences, and vice versa. *In re Computer Universe, Inc.*, 58 B.R. 28, 14 Coll.Bankr.Cas.2d 403, Bankr.L.Rep. (CCH) ¶ 71,038 (Bankr.M.D. Fla.1986); *In re Villa Roel, Inc.*, 57 B.R. 879, 14 Coll.Bankr.Cas.2d 523 (Bankr.D.D. C.1985). See also *In re Energy Sav. Center, Inc.*, 61 B.R. 732 (E.D.Pa.1986) aff'g, 54 B.R. 100 (Bankr.E.D.Pa.1985) (not a preference but a fraudulent transfer).

■ The courts have also treated similar transactions as making the lender or lessor a creditor of the debtor corporation, even though the corporation was not a party to the loan or lease. *In re Eton Furniture Company*, 286 F.2d 93 (3d Cir.1961); *In re Computer Universe, Inc.*, 58 B.R. 28, 14 Coll.Bankr.Cas.2d 403, Bankr.L.Rep. (CCH) ¶ 71,038 (Bankr.M.D.Fla.1986); *In re Villa Roel, Inc.*, 57 B.R. 879, 14 Coll.Bankr. Cas.2d 523 (Bankr.D.D.C.1985). The court could possibly treat the bank as a creditor of C–L Cartage, but the court need not decide. For the reasons stated below, the court concludes that the trustee should recover from the bank as the initial trans-

feree of the preferences under § 550(a)(1), even if the bank itself was not a preferred creditor.

The court believes Carlos Foster's testimony that he asked for the loans to be made to C–L Cartage but the bank refused. The bank's vice-president testified that C–L Cartage did not submit written loan applications. Obviously, Carlos Foster would not have submitted written loan applications on behalf of C–L Cartage after the bank had already turned it down. The bank knew that the loans to Carlos Foster were really loans to C–L Cartage.

The court can assume that the bank does not refuse to make loans to all corporations without regard to their financial condition. It may prefer to have as the debtor a real live person, rather than the legal fiction of a corporation, but that can be accomplished by making the loan directly to the corporation and obtaining the co-signature or guarantee of a corporate officer or anyone else willing to pay the debt on the corporation's behalf. It appears that the bank made the loans to Carlos Foster to avoid having the debt owed by the intended beneficiary of the loans, C–L Cartage, because it was less likely to be able to pay the debts. Making the loans to Carlos Foster was nothing more than a means for the bank to make the loans to C–L Cartage and hopefully avoid the risks that might result from C–L Cartage's financial condition.

One such risk was the recovery of preferential payments received from C–L Cartage, if it later went into bankruptcy, and the loans had been made to C–L Cartage. The court does not think the bank could avoid this risk by the simple expedient of making the loans to C–L Cartage through Carlos Foster, as the debtor rather than a co-signer or guarantor. Bank lending officers probably are not always thinking of ways to avoid problems that might result from the bankruptcy of a corporate borrower. The court, however, sees no good reason to allow such an easy method of protecting preferential payments received from a corporate debtor that the lender knew was the intended beneficiary of a loan it made through a third person for the purpose of avoiding problems that might result from the corporation's dim financial prospects.

The court concludes that the trustee can recover from the bank as the initial transferee of the payments that were preferential to Carlos Foster and his mother but were not preferential to the bank, assuming it was not a creditor.

The bank could argue that it should be given the defenses of a subsequent transferee, as if the debtor paid Carlos Foster who passed the money on to the bank. As to all the payments except the three made through Carlos Foster's mother, the bank was not a subsequent transferee and should not be treated as such. *In re Energy Sav. Center, Inc.,* 61 B.R. 732 (E.D.Pa.1986) aff'g, 54 B.R. 100 (Bankr.E.D.Pa.1985). Furthermore, treating the bank as a subsequent transferee, or giving it the good faith defense of a subsequent transferee, should not be allowed. It would, as explained above, give lenders an easy method for protecting preferential payments from recovery by the corporation's bankruptcy trustee.

As to the checks written to Carlos Foster's mother, the bank might still be the initial transferee. The court need not answer the question because the payments were made more than 90 days before bankruptcy and cannot be recovered as preferences, as explained below.

The trustee generally can recover preferential payments only if they were made within the 90 days before the date on which the bankruptcy petition was filed. 11 U.S.C. § 547(b)(4)(A). However, preferential transfers to an insider, such as Carlos Foster, can be recovered if they were made within a year before bankruptcy. 11 U.S.C. § 547(b)(4)(B) & § 101(28). A literal reading of §§ 547(b)(1) and 550(a)(1) would allow the trustee to recover preferential payments to a non-insider creditor made more than 90 days but within a year before bankruptcy if the payments also preferred an insider. Most courts, however, have

rejected this interpretation of the statutes. They have held that insider preferences outside the 90 days can be recovered only from the insider. See V. Countryman, The Trustee's Recovery in Preference Actions, 3 Bankr.Dev.J. 449, 464 (1986); but see *In re Big Three Transportation, Inc.*, 41 B.R. 16 (Bankr.W.D.Ark.1983). The court agrees with the majority. Certainly, it would not make sense to treat the bank differently on the ground that it was not a preferred creditor.

Thus, the court rejects a literal reading of § 550(a)(1) on this point but adopts a literal reading on the issue of whether the bank is liable as an initial transferee despite not being a creditor. Logical consistency does not always make sense in applying statutes meant to cover a broad spectrum of factual situations.

The trustee can recover from the bank the payments it received on either loan within 90 days before bankruptcy (March 2, 1984). This includes the December 12, 1983 and January 17, 1984 payments on the first loan and the January 31, 1984 payment on the second loan. The total is $3,756.07 ($1,399.31 + $1,399.31 + $957.45).

■ The question remains whether the trustee can recover the payments made between 90 days and one year before bankruptcy as fraudulent transfers. The particular kind of fraud involved is constructive fraud—fraud without the actual intent to hinder, delay or defraud creditors. A transfer is constructively fraudulent if the debtor made it while insolvent and in return for less than a reasonably equivalent value. 11 U.S.C. § 548(a)(2)(A). Value includes payment of an antecedent debt owed by the debtor. 11 U.S.C. § 548(d)(2)(A). The proof showed that the debtor was insolvent when all the payments were made. The argument is that the debtor's payment of Carlos Foster's debts to the bank was for less than a reasonably equivalent value because the debtor did not owe the debts.

The courts have long recognized that a debtor can pay its debt to X by paying X's debt to Y. The debtor's payments to Y must reduce the debtor's legitimate debt to X. The reduction of the debt must be "reasonably equivalent" value in return for the payments. And, when multiple transactions are considered together, the end result must not violate the statutory purpose of conserving the debtor's property for the benefit of its creditors. Compare *Barr & Creelman Mill & Plumbing Supply Co. v. Zoller*, 109 F.2d 924 (2d Cir. 1940); *Mandel v. Scanlon*, 426 F.Supp. 519 (W.D.Pa.1977); *Hofler v. Marion Lumber Company*, 233 F.Supp. 540 (E.D.S.C.1964), and *In re B-F Building Corp.*, 312 F.2d 691 (6th Cir.1963); *Bennett v. Rodman & English, Inc.*, 2 F.Supp. 355 (E.D.N.Y. 1932); *In re Chase & Sanborn Corp.*, 51 B.R. 739 (Bankr.S.D.Fla.1985).

> The rule has been explained as follows: In each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred. Thus, although these "indirect benefit" cases frequently speak as though an "identity of [economic] interest" between the debtor and the third person sufficed to establish fair consideration, ..., the decisions in fact turn on the statutory purpose of conserving the debtor's estate for the benefit of creditors.

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 992 (2d Cir.1981).

Based on the court's conclusion that the debtor owed a debt to Carlos Foster for the money he borrowed from the bank and contributed to the debtor, this case meets the criteria of the indirect benefit cases and the payments were not fraudulent transfers.

The Bankruptcy Code did not change the indirect benefit rule by defining "value" to mean payment of a debt "of the debtor". 11 U.S.C. § 548(d)(2)(A). For example, the payments to the bank in this case were payments on the debtor's debt to Carlos Foster.

It may not make a difference whether the debtor corporation actually owes a debt to the stockholder so long as the money or property that gave rise to the stockholder's debt was in fact received by the corporation. *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823 (5th Cir.1959); *In re Evans Potato Company, Inc.*, 44 B.R. 191, 12 Bankr.Ct.Dec. 518 (Bankr.N.D.Ohio 1894). The court, however, need not decide since it has concluded that the debtor owed Carlos Foster a debt.

The court will enter an order accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.