In re Donald L. DAVENPORT and
Mary J. Davenport, Debtors.

Leslie A. DAVIS, Trustee, Plaintiff,

v.

Donald L. DAVENPORT, Mary J. Davenport, D.L. Davenport, Jr., Mark Davenport, and NDS Plastics, Inc., Defendants.

Bankruptcy No. 89–40686–293.
Adv. No. 89–4192–293.

United States Bankruptcy Court,
E.D. Missouri, E.D.

Oct. 13, 1992.

Scott A. Greenberg, Clayton, Mo., for plaintiff.

James Durham, Clayton, Mo., for Donald Davenport, Sr.

Steven Goldstein, St. Louis, Mo., Attorney for Mary J. Davenport, Donald Davenport, Jr. and Mark Davenport.

James S. Cole, St. Louis, Mo., Asst. U.S. Trustee.

Craig Smith, Clayton, Mo., for Landmark Bank.

## MEMORANDUM OPINION

DAVID P. McDONALD, Chief Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri and Section 428.020 R.S.Mo. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(E) and (J), which the Court may hear and determine.

### INTRODUCTION

Leslie A. Davis, Trustee, filed an eight count First Amended Adversary Complaint seeking in:

Count I to set aside a transfer of funds from the Debtors to their two sons D.L. Davenport and Mark Davenport pursuant to Mo.Rev.Stat. § 428.020 (1986);

Count II to enjoin the Defendants from any further transfer of funds;

Count III to obtain an accounting;

Count IV to impose constructive trust on funds improperly diverted into NDS Plastics Inc.;

Count V, as an alternative to imposing a constructive trust, to pierce the corporate veil of NDS Plastics and hold the Debtors and their sons personally liable for repayment of the funds;

Count VI to set aside as fraudulent under 11 U.S.C. § 548, a transfer of funds to Mark Davenport;

Count VII to deny Debtors Discharge under 11 U.S.C. § 727; and

Count VIII as a further alternative, the issuance of a money judgment against both the Debtors and sons.

A Preliminary Injunction was issued on August 21, 1989 as requested by the trustee in Count II of his First Amended Adversary Complaint.

A Stipulation between the Plaintiff and all of the Davenport Defendants was filed by Scott Greenberg, attorney for the trustee and James Durham, attorney for the defendants. On the day of the trial Mr. Durham sought and was granted leave to withdraw as attorney for the Debtor Mary J. Davenport and the Debtors' sons D.L. Davenport and Mark Davenport. Steven Goldstein entered his appearance on behalf of Mrs. Davenport and the sons. Although, Mr. Goldstein did not represent Mrs. Davenport or the sons when the Stipulation was signed, Mr. Goldstein expressed a willingness to also sign the Stipulation if paragraph 17 of the Stipulation was amended to read as follows:

"17. In or about late 1987 and early 1988 an investment of $600,000 was made into NDS. A $500,000 loan was made, one-half in the name of each son and $100,000 worth of equity in the corporation, one-half in the name of each son."

The trustee did not consent to the proposed amendment and the Court denied the request, since the sons were previously represented by counsel when the Stipulation was executed on behalf of all the Davenport defendants.

## FINDINGS OF FACT

Upon consideration of the Stipulation, argument of counsel, Trustee's Proposed Findings of Fact and Brief and the evidence adduced at trial, the Court makes the following findings of fact:

1. Donald L. Davenport ("Davenport") and his wife Mary J. Davenport (collectively the "Debtors") filed their voluntary Chapter 7 petition on February 21, 1989.

2. D.L. Davenport, Jr. ("Don, Jr.") and Mark Davenport ("Mark") are the sons of the Debtors.

3. NDS Plastics, Inc. ("NDS") is a Missouri Corporation.

4. On April 8, 1986 (approximately two months before Landmark Bank filed suit against the Debtors), Donald L. Davenport's Commerce Bank account # 081909118 had a balance of $1,121,498.98.

5. In June of 1986, Landmark Bank filed suit in the Circuit Court of St. Louis County against the Debtors seeking to enforce a certain guaranty executed by the Debtors in favor of Landmark Bank in the amount of $481,869.64 plus interest and further seeking the sum of $100,000.00 as a result of Landmark having paid said sum to the beneficiary of a letter of credit it posted on behalf of the Debtors. Said lawsuit was scheduled to go to trial at the time the Debtors filed their petition in bankruptcy.

6. On or about July 23, 1986, a money market account was opened with a deposit of $100,000.00 at Sun Bank in Miami, Florida in the name of "Donald L. Davenport or Mark Davenport", account # 0599008504482. On or about November 21, 1986, the sum of $825,000.00 was wire transferred from Davenport's Commerce Bank account # 081909118 to the Sun Bank account # 0599008504482. Davenport could not recall where he obtained the $100,000.00 he used to establish the Sun Bank account.

7. On or about March 23, 1987, Davenport transferred the sum of $939,329.70, the entire balance from the Sun Bank account # 0599008504482 in the name of "Donald L. Davenport or Mark Davenport", to another account at Sun Bank, # 0599008505729 in the name of the sons "Mark Davenport or Don L. Davenport, Jr.".[1] There was no consideration given for this transfer. After April 8, 1987 there were no further funds transferred in or out of Sun Bank account # 05990085404482. On April 15, 1987, check 101 was issued from the sons' Sun Bank account to their father in the amount of $50,000.00. Davenport acknowledged he used the $50,000.00 for his own personal living expenses. He was uncertain whether his son had signed the check or Davenport simply used his son's signature stamp. Davenport also wrote two other checks numbered 102 and 103, payable to himself on the sons' Sun Bank account, dated August 10, 1987 and October 13, 1987. Again, he could remember neither whether he used his son's signature stamp nor the intended purpose of the checks. He finally concluded he was returning the excess funds to himself to be used for living expenses and attorney's fees.

8. On or about April 15, 1988, Debtors filed gift tax returns for 1987 reflecting gifts to their sons of $300,000.00 each. Although Davenport actually transferred a total of $939,329.70 into his sons' account, $600,000.00 of which represents the alleged gift, he never relinquished control over any of these funds. Davenport testified his sons were free to use the $600,000.00 as they pleased, but in fact he continued to utilize these funds as he pleased, with little or no consultation with his sons or his wife. At one point during his testimony concerning the transfer, Davenport stated: "When I gave them the loan of $600,000.00 ... or the ... excuse me ... when I gave them the gift of $600,000.00". Mary J. Davenport said she was unaware of these transfers. It should be noted that at the time of

---

1. Mr. Christopher E. Phillips, Vice President of Landmark Bank, testified that as of March 23, 1987 the Debtors owed his bank in excess of $650,000.00 (i.e., principal $451,612.33, letter of credit $100,000.00, approximately accumulated interest in excess of $100,000.00 plus undetermined expenses for legal fees.)

the transfer, Mark was a 20 year old college student and his brother, Don, Jr., was described by his father as a man lacking business and bookkeeping skills. In fact, Davenport did not believe Don, Jr. had ever written a check until after the meeting of creditors on May 2, 1989. Mrs. Davenport's attorney stipulated that from birth Don, Jr. operated "on low range of average intelligence and has a history of physical and emotional problems." In addition, as Don, Jr. grew up he had problems with alcoholism. Accordingly, the Court finds that these alleged transfers were a sham, and that a true gift was never consummated. Mr. Davenport maintained full control over the funds and never actually gave $939,329.79 to his sons.

9. The monthly statements from the Sun Bank account in the name of "Mark Davenport or Don L. Davenport, Jr." were mailed to Davenport at his St. Louis addresses at 250 South Brentwood Blvd., and later at 202 North Brentwood. At least one of the actual checkbooks on said account was kept by Davenport at his home in St. Louis.

10. On or about August 18, 1987 a check in the amount of $160,000.00 was drawn on the Sun Bank account # 0599008505729 in the name of "Mark Davenport or Don L. Davenport, Jr." for the purchase of a printing press. As of February 2, 1988, the balance of this account was $8,551.69 and thereafter during the remainder of 1988 and all of 1989 this account's balance never rose above $20,-000.00.

11. The printing press was later sold to Carl Lang, who leased it back to NDS.

12. The proceeds from the sale of the printing press were not returned to the Sun Bank account in the name of "Mark Davenport or Donald L. Davenport, Jr."

13. In or around late 1987 and early 1988. the sons each invested $300,000.00 in NDS. Each son's investment consisted of a $250,000.00 loan to NDS and the purchase of $50,000.00 worth of equity in the corporation.[2]

14. At least $430,000.00 of the funds the sons invested in NDS came out of Sun Bank account # 0599008505729 in the name of "Mark Davenport or Don L. Davenport, Jr.," and were transferred to a Mark Twain Bank account in St. Louis # 3618121006 in the name of D.L. Davenport, Jr. and Mark Davenport before being transferred to NDS. On January 26, 1988, $30,000.00 was transferred from Davenport Investment Co., which was owned by Davenport, to his sons' Mark Twain account. This transfer left Davenport Investment Co.'s account with a zero balance. Davenport could not provide a reason why he commingled his $30,000.00 with his sons' $430,000.00, except that he assumes they needed the money to buy NDS.

15. Davenport had signature stamps, with the names of his sons, Don Davenport, Jr. and Mark Davenport, which he used to sign checks on the sons' Mark Twain account. The funds in the Mark Twain account which Davenport utilized were traceable to the money Davenport allegedly gave to his sons as a gift. Davenport admitted he normally did not discuss the issuance of these checks with his sons before he wrote them in their names. Davenport used the Mark Twain account as if it was his own. He routinely issued checks for his own purposes by simply stamping one of his son's signatures on the check. The following are examples of such conduct:

| Date | Payable To | Amount | Purpose |
| --- | --- | --- | --- |
| 2/25/88 | Davenport | $15,000 | Memo indicated a loan to Davenport. Davenport could not explain the loan, but speculated it was to reimburse himself for Mark's medical bills. He testified, "I would say it was a loan but I am just not sure." |

2. In the Stipulation this paragraph was numbered 17 and was the paragraph Mr. Goldstein sought to amend as previously indicated in the *INTRODUCTION.*

| | | | |
|---|---|---|---|
| 11/28/88 | Davenport | $ 4,382 | The check memo indicated "repayment of loan" but Davenport could not recall why the check was issued. |
| 2/28/89 | Love, Lacks & Paule | $ 7,024 | This check was payable to Davenport's attorneys for his personal legal fees. |
| 4/18/89 | M.J. Davenport | $ 1,500 | Davenport could not provide an answer as to why he wrote this check to his wife and marked the memo as a loan. He could not explain why his sons would be lending funds to their mother. |
| 5/1/89 | Davenport | $ 4,000 | Memo indicated the check was for a loan from "D.L., Jr. and Mark." Davenport never repaid this loan and he stated he borrowed the money for his current expenses. At this point in time he said he was earning $84,000 from NDS, but was not capable of living on his income without borrowing money from his sons. |
| 7/31/89 | Davenport | $12,767 | Davenport used these funds for personal living expenses. |

It should be noted that the Davenports filed their Chapter 7 voluntary petition on February 21, 1989. Subsequent to the meeting of creditors, a total of $42,962.00 was drawn from the sons' Mark Twain Bank account by either Davenport or Don, Jr. for their apparent benefit:

| Date | Payable To | Amount | Purpose |
|---|---|---|---|
| 6/2/89 | cash | $ 9,900 | Davenport wrote this check and used Don, Jr.'s signature stamp. It was endorsed by Don, Jr., therefore Davenport assumed his son used the money. |
| 6/5/89 | cash | $ 3,500 | Davenport wrote the check and Don, Jr. signed the check. Davenport did not know how his son used these funds. |
| 7/5/89 | cash | $ 7,000 | Don, Jr. wrote and cashed this check. The purpose of this check is unknown. |
| 7/31/89 | D.L. Davenport | $12,762 | Memo indicates loan. Davenport testified he used these funds for living expenses. |
| 8/4/89 | Don, Jr. | $ 9,800 | Don, Jr. took these funds for a personal vacation. |

16. Davenport was at all times prior to the sale of NDS, except for the period immediately prior to the sale of NDS, president of NDS and member of its board of directors, but owned no stock in the company. The sons were neither officers nor directors of NDS.

17. Although the parties stipulated that at all times, until the summer of 1989, Davenport's NDS salary was $90,000.00, he testified that it was actually $84,000.00.

18. On or about March 11, 1988, the Debtors sold their Florida condominium. The Debtors realized net proceeds of $84,288.80 from this sale. Mr. Davenport testified that they had purchased the condo in 1981 for between $120,000.00 and $135,000.00 and had added approximately $25,-

000.00 in improvements.[3] Therefore, Davenport argued that in 1982 they had "... $165,000.00 in it ..." and with a 5% annual increase in Florida real estate, along with the improvements, the condo should have been worth $200,000.00 when Landmark Bank filed suit against the Davenports. He attributed the low sale price to a depressed Florida real estate market, which followed the October, 1987 stock market crash on "Black Monday". Mr. Davenport was uncertain as to how long they had the property on the market, but he knew that it was listed before the crash for $200,000.00 to $225,000.00 and they had only received one offer.

19. On August 8, 1989, this Court entered its Temporary Restraining Order, as requested by the trustee in Count II of the Adversary Complaint, ordering that all Defendants be restrained from further transferring, concealing and/or dissipating any of the "Funds" as that term is defined in the trustee's Adversary Complaint. Said Temporary Restraining Order also ordered that:

"... Debtors shall file a written accounting with this Court within ten (10) days from the date of this order detailing with specificity the amount of 'Funds' transferred to the 'Sons' (as those terms are defined in the trustee's Adversary Complaint) since January 1, 1987 and further detailing with specificity an exact tracing of said Funds and the present whereabouts of the Funds and all interest earned thereon and/or proceeds thereof."

A copy of this order was mailed to all Defendants, including the Debtors. The Debtors have never prepared nor filed any written accounting as required by this Temporary Restraining Order.[4]

20. On August 21, 1989, by consent of the parties, this Court issued its Preliminary Injunction ordering that the Defendants cease, desist and refrain from further transferring, concealing and/or dissipating any of the funds transferred on March 23, 1987 by wire transfer at the Sun

Bank of Miami, Florida in the amount of $939,329.79, and further prohibiting any sale or other transfer of the stock or assets of NDS without giving the trustee forty-eight (48) hours written notice of any proposed sale.

21. The Debtors and the trustee entered into an agreement to allow the Debtors to purchase their household furnishings by paying the estate the sum of $5,745.00, which represented the equity in furniture. Although this agreement was entered into after the Court had issued its Preliminary Injunction, which ordered the Debtors to cease any further dissipation of the funds transferred on March 23, 1987, Davenport gave the trustee a check drawn on his sons' Mark Twain Bank Account. The funds in the Mark Twain Bank account came from the March 23rd transfer.

22. In September, 1989, the assets of NDS were sold to Mexico Plastics Company, with the consent of the trustee. All of the funds received by NDS were used to pay off bank debt and no monies were received by the Debtors, their sons or the trustee from the sale of NDS's assets. The sons' investment of not less than $600,-000.00 into NDS was entirely dissipated.

23. During the year immediately preceding the filing date the Debtors, without receiving consideration, transferred approximately $25,000.00 to Mark Davenport for living expenses, tuition and other personal expenses. Mark Davenport was under twenty-one years of age at that time. Davenport testified that he felt obligated as a father to pay Mark's expenses while he was in college. However, while Davenport was paying his son's college expenses out of the Davenports' bank account, Davenport continued to withdraw funds from his sons' Mark Twain account to cover his personal expenses. He explained this apparent inconsistency by stating he was a poor bookkeeper.

24. After the filing of the trustee's Adversary Complaint and Request for Temporary Restraining Order, but before any or-

---

3. In his deposition of February 10, 1990 he stated, "I think I paid 135, plus furnishings of around 70 or 80,000, in that neighborhood."

4. The parties stipulated that, "The Debtors have not, as of the date of this Stipulation, filed with

the Court any written accounting as required by the Temporary Restraining Order."

der had been entered by the Court, Don Davenport, Jr. liquidated the remaining proceeds in the Mark Twain account by writing a check to himself, in the amount of $9,800.00 (dated August 4, 1989), which contained proceeds from the March 23rd transfer. The check was designated as "Vacation Fund" and in fact he used the money to take a vacation. Davenport testified as to a conversation he had with his son Don, Jr. concerning the request for a restraining order. Davenport told his son he did not believe the TRO would be sustained. When Don, Jr. asked if the money was his, Davenport said, "Yes". Don, Jr. then said if I don't take the money I will never get it. In his deposition Don, Jr. stated that he barely saw his father before his departure and the extent of his conversation was "good-bye". He further stated that the $9,800.00 was his money and he took it for his vacation. He also said he did not know that the trustee was making a claim to these funds. On July 5, 1989, prior to the filing of this adversary, Don, Jr. cashed a $7,000.00 check on the Mark Twain account. Don, Jr. had never filled out a check in his life until after the first meeting of creditors.

25. The trustee made repeated efforts to have the Debtors cooperate with the trustee in turning over records and documents. The Debtors failed and/or refused to fully and adequately cooperate with the trustee. However, it should be noted that the Court finds that Mary L. Davenport lacked sufficient knowledge of her family's financial affairs to assist the trustee. She was not only unaware of the fact that Mr. Davenport had transferred $600,000.00 or $939,329.70 to their two sons, but she initially denied said transfer had occurred because she did not believe they had $600,-000.00 to give to their sons. Her name was not on the various bank accounts and she did not participate in the transfer of funds, with the exception of funds for her college son's living expenses. In contrast, her husband, Donald L. Davenport, controlled the family's financial affairs and decision making. Although he testified that he had successfully made millions of dollars by developing, and buying and selling approximately seven companies, he was unable to answer questions dealing with his more recent financial dealings. Often his testimony was vague and forgetful. He sloughed off his lack of knowledge of his personal financial affairs by simply stating he was a poor bookkeeper. For example, when he was asked by the Plaintiff's attorney where $100,000.00 came from that appeared as a deposit in August 8, 1986 on the Sun Bank Account that he held with his son Mark he said, "I have no idea where the $100,000.00 came from—that's four years ago."

26. Under oath the Debtor Donald Davenport gave false testimony in the 341 Meeting of Creditors on March 27, 1989, and in depositions taken on June 2, 1989 in connection with this case. Under oath he had stated that he transferred $600,000.00 to his sons, when in fact the transfer was $939,329.79. The trustee or his attorney, at various times during the said meeting of creditors and depositions, requested Davenport to produce documents evidencing the alleged gift transfer. On or about July 14, 1989, counsel for the Debtors turned over to the trustee's attorney certain documents from Sun Bank evidencing the transfer, which indicated that the actual transfer by Davenport to his sons was $339,329.70 higher than he had testified in both the 341 creditors' meeting and depositions. Davenport testified that he and his wife promptly cooperated with the trustee by either producing requested documents or signing papers that authorized the banks to release the information to the trustee. In contrast, the trustee asserts that what little cooperation he received was slow in coming. In order to learn the Debtors' true financial status and trace the various money transfers, it was necessary for the trustee to subpoena the records of the various banks.

## DISCUSSION

In his original Complaint, the trustee requested the Court to set aside the March 23, 1987 transfer of $939,329.70, turnover the sons' NDS stock to the trustee for the benefit of the estate, enter a personal judgment against the Debtors and their sons for any loss and deny Debtors their discharge pursuant to 11 U.S.C. § 727. Subsequent to the filing of the instant com-

plaint the trustee acquiesced in the sale of NDS's assets, which reduced the value of the stock to little or nothing. As a result, the trustee's Amended Complaint now seeks both an avoidance of the transfer and a personal judgment against the Debtors and their sons for the sums that have been dissipated, pursuant to 11 U.S.C. § 550.

Throughout the course of this case, the trustee has repeatedly complained that the Debtors have failed to sufficiently cooperate to enable the trustee to perform his duties and that the Davenports have failed to comply with the duties imposed on a debtor by 11 U.S.C. § 521(3) and (4). In Count VII of his First Amended Adversary Complaint the trustee seeks to deny the Debtors their discharge pursuant to 11 U.S.C. § 727(a). The conduct, knowledge and activities of the two Debtors are not identical; therefore, it is necessary to analyze each debtor's behavior separately.

■ In the case of Mrs. M.J. Davenport, the trustee has failed to present any evidence that would justify denying her a discharge pursuant to 11 U.S.C. § 727 or to award a monetary judgment against her under 11 U.S.C. § 550. Mr. Davenport was a seasoned entrepreneur, who had successfully made millions of dollars by developing, and buying and selling companies. In contrast, there was no evidence introduced which would indicate Mrs. Davenport had participated with him in the business world.[5] Mr. Davenport testified that his wife had excellent taste but could not maintain a budget. Although he had never objected to her expenditures in the past, he was forced to take her checkbook away from her in November, 1988. As previously indicated, the Court found that Mrs. Davenport did not participate in her husband's investments and that she lacked knowledge of the family's financial affairs. Her name did not appear on any bank accounts, significant checks or transactions that are in issue.[6] Not only was she unaware of the fact that Mr. Davenport had transferred large sums to their sons, she initially denied such transfers had occurred because she did not believe she and her husband possessed $600,000.00 to give to their sons. Accordingly, as to the defendant Mrs. Mary J. Davenport ALL COUNTS of the trustee's First Amended Adversary Complaint are DISMISSED.

■ In order to determine if Donald L. Davenport should be denied his discharge, it is essential to analyze his conduct and testimony, in light of his business background and to consider the following pertinent provisions of 11 U.S.C. § 727:

"§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; ... or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond

---

5. The Debtors' Schedule B–2—Personal Property (t) indicates that Mrs. Davenport owned "... 100% of stock in M.J. Interiors, Inc. Value based on furniture, fixtures, samples, and other tools of the trade. Wife is sole employee of corporation." The stock was valued at $1,200. Their schedule of Current Income and Current Expenditure revealed a regular monthly income of $1,000 from the operation of M.J. Interiors. During the course of the trial there was no evidence introduced that would reveal the type of work Mrs. Davenport performed for M.J. Interiors, Inc. or the extent of her business knowledge as reflected by her activities with M.J. Interiors.

6. Checks were introduced that were signed by Mrs. Davenport, but they dealt with funds sent to the Debtors' son for college expenses and not transfers of large sums.

to a material question or to testify; ... or ..."

During his sworn testimony in the Meeting of Creditors on March 27, 1989 and during his deposition taken on June 2, 1989, he was questioned extensively concerning transfer of funds to his two sons. He repeatedly stated that upon the advice of his tax advisor he had given each of his two sons $300,000.00. The trustee and his attorney made numerous requests for some proof of the transfer. It was not until July 14, 1989 that the Debtors' counsel turned over to the trustee's attorney documents from the Sun Bank in Florida that revealed that Davenport had actually transferred $939,329.79 to his sons' bank account. The trustee argues, and I find, the Debtor Donald L. Davenport should be DENIED HIS DISCHARGE, pursuant to 11 U.S.C. 727(a)(4)(A), for having made a false oath. Davenport's testimony was a material misrepresentation of his financial affairs. It is the Debtors' duty to answer all of the trustee's questions concerning their financial affairs and transactions in an accurate, candid and truthful manner so as to provide the trustee with a full disclosure. Having received this full disclosure, it becomes the duty of the trustee to determine if a given asset is that of the estate, has been improperly transferred or rightfully belongs to some third party. In *Mertz v. Rott*, 955 F.2d 596 (8th Cir.1992), the Eighth Circuit recently held that the Debtor's failure to disclose, in his schedules, that he anticipated and subsequently received a New York state tax refund, was a false oath and a material misrepresentation justifying the denial of his discharge, even though the refund was allegedly exempt. The Court found that, "The tax refund was an asset of his estate that Mertz was required to disclose to his creditors. The amount involved—$1358—was not insubstantial." Obviously, if $1,358.00 is not considered insubstantial, $339,329.79 would not be considered insubstantial. The fact that Davenport believed the transferred funds were not part of his estate does not permit him to give a false oath. As stated in *In re Mascolo*, 505 F.2d 274, 278 (1st Cir.1974), "The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." It was the duty of the Debtors to make a full disclosure and thus provide the trustee with the opportunity to pursue the $339,329.79, if he felt such pursuit was appropriate. Accordingly, Donald L. Davenport is DENIED HIS DISCHARGE pursuant to 11 U.S.C. § 727(a)(4)(A).

■ On August 8, 1989, this Court entered its Temporary Restraining Order, as requested by the trustee in Count II of the Adversary Complaint. Said Temporary Restraining Order provided in part:

"... Debtors shall file a written accounting with this Court within ten (10) days from the date of this order detailing with specificity the amount of 'Funds' transferred to the 'Sons' (as those terms are defined in the trustee's Adversary Complaint) since January 1, 1987 and further detailing with specificity an exact tracing of said Funds and the present whereabouts of the Funds and all interest earned thereon and/or proceeds thereof."

The Debtors neither objected to the entry of this TRO nor requested additional time to comply with the "accounting" provisions. The Debtors admitted in their *Stipulation Between Plaintiff and Defendants Donald L. Davenport, Mary Joan Davenport, D.L. Davenport, Jr. and Mark Davenport* and Davenport testified that they have never prepared nor filed any written "accounting" as required by the TRO. The TRO was a lawful order of this Court and his refusal to obey it is another ground, under 11 U.S.C. § 727(a)(6), on which this court denies Donald L. Davenport's discharge. *See In re Dreyer*, 127 B.R. 587 (Bankr.N.D.Tex.1991). Accordingly, Donald L. Davenport is DENIED HIS DISCHARGE pursuant to 11 U.S.C. § 727(a)(6).

■ The TRO also ordered Mrs. Davenport to provide an "accounting". However, I have found that Mrs. Davenport lacked knowledge of the family's financial affairs and, therefore, I further find that it was not within her ability or capacity to comply

with the "accounting" provisions of the TRO. Accordingly, she shall NOT BE DENIED HER DISCHARGE pursuant to provisions of 11 U.S.C. § 727.

█ ·Davenport steadfastly insisted that he and his wife had either promptly turned over all requested documents that were in their possession or signed the necessary releases that would permit the trustee to obtain those documents from the appropriate institutions and/or individuals. In contrast, the trustee denied that the Debtors had provided all the requested information and claimed he was forced to subpoena records from the banks and individuals in order to obtain a complete picture of the Davenports' financial transactions. The Debtors did in fact turn over some documents to the trustee, but it is difficult to determine the extent of their cooperation from a review of the trial record. However, for reasons stated below I do not find Davenport to be a totally credible witness.

Davenport had successfully bought, developed and sold seven companies during his business career. In 1966 he invested $2,500.00 to start a company which he sold in 1980 for $4,000,000.00. In 1985 his net worth exceeded $4,000,000.00. He had also served as a member of the Board of Directors of the Landmark Bank. Within his family he alone made all the financial decisions. In fact, he testified that his wife had faith in him and he discussed their financial affairs with her as little as possible. His vast business experience and impressive career would lead anyone to assume that Davenport would maintain records and possess a working knowledge of his business transactions. If he maintained business records, they were either incomplete or he chose not to turn them over to the trustee. A review of his sworn testimony at the Meeting of Creditors, depositions and the instant trial reveals a pattern of evasive and vague answers. He would excuse his lack of knowledge, poor memory and his inability to answer questions pertaining to his personal financial transactions by stating that he was a poor bookkeeper or that he simply did not remember. When asked why he wrote the following checks to himself on his sons' checking account he answered in the following manner:

| Date | Check # | Amount | Davenport's Response |
|------|---------|--------|----------------------|
| 8/10/87 | 102 | $100,000.00 | "I am not positive what it was used for. I believe I was returning the excess—used for living expenses and attorney fees." |
| 11/6/87 | 103 | $100,000.00 | "I don't know how this was used, went into one of these bank accounts." |
| 11/12/87 | 105 | $ 75,000.00 | "I owned Davenport Investment, to give back the excess over the $600,000.00—not positive why check was written." |

Davenport also testified that he could not recall where he had obtained the $100,-000.00 that he deposited in a money market account at Sun Bank on July 23, 1986. Although Davenport testified that he had not invested his money in NDS, he admitted that he had deposited $30,000.00 from his company, Davenport Investments, into his sons' bank account, which was later used in their investment in NDS. When asked why funds from Davenport Investment were used to partially finance his sons' investment, he responded, "I just don't know." When asked where he obtained the funds for an August 8, 1986 deposit of $100,000.00, he answered, "I have no idea where the $100,000.00 came from. That is four years ago."

It is understandable that the passage of time may dim the memory of a witness. Certainly, no one would expect Davenport to remember the source of small deposits or the purpose of checks written for a few hundred or possibly even a few thousand

dollars. However, I find Davenport's testimony lacks credibility when he repeatedly is unable to remember or explain deposits and checks in the range of $100,000.00. This is particularly true when one considers that before he testified in the instant trial, he had already been questioned by the trustee and various attorneys at the meeting of creditors and at his depositions. He certainly knew from these experiences the types of questions that would be asked at trial. He had ample opportunity to gather and review his records before the trial so that he could have provided a fuller explanation of his financial transactions. He was represented by an attorney throughout all of these proceedings.

The question remains whether Davenport's cooperation was sufficient to meet his duties as a debtor under the provisions of 11 U.S.C. § 521(3) and (4). Although the record indicates that he did turn some records over to the trustee and sign releases for other documents, the record taken as a whole reveals that at best this alleged cooperation was selective and not complete. I arrive at this conclusion, not only after considering the entire record in this case, but also for the reason, previously outlined, that I do not consider Davenport to be a credible witness. I do not believe a man with such a long history of business success and acumen would fail to maintain important business records or fail to remember the source of hundreds of thousands of dollars that were shifted from bank to bank. Accordingly, I have found that Donald L. Davenport has not fully cooperated with the trustee and therefore is DENIED HIS DISCHARGE pursuant to 11 U.S.C. § 727(a)(4)(D).

▋ In Count VI the trustee seeks an order setting aside a transfer of approximately $25,000.00 and directing Mark Davenport to turnover to the trustee the $25,000.00 for the benefit of the estate, pursuant to 11 U.S.C. § 548. Evidence was adduced that during the year preceding the filing of this voluntary petition the Debtors issued a series of checks totaling $24,993.00 to their son Mark Davenport. Mark was a college student at St. Thomas University, Florida and lived away from home during this period. Some of the checks were clearly identified as tuition $3,315.00, rent $3,325.00 and dental expenses $53.00, while others, ranging in amounts from $1,000.00 to $1,800.00, were payable to Mark without explanation. The Debtors claim these checks simply represent their son's necessary college expenses for which they felt responsible. Although $24,993.00 appears to be extremely generous support for a college student, when you consider the tuition was only $3,315.00, the trustee failed to show that the amount was excessive or that this particular transfer of funds was made "... with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted;" 11 U.S.C. § 548(a)(1). Accordingly, I find for the Defendants as to Count VI.

In Count VIII of his Amended Complaint, the trustee, through his attorney, asks this court to enter a money judgement against the Debtors and their sons for the value of the funds transferred in the March 23rd transfer. The trustee asserts that this court has the authority, under section 550(a) of the Bankruptcy Code, to enter such a money judgement. Section 550 of the Bankruptcy Code provides in part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 554, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

. . . . .

(c) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

11 U.S.C. § 550.

▋ Before the court can enter a money judgement, under section 550, against an entity, the trustee must establish the existence of an avoidable transfer.

184

In this case, the trustee alleges that the March 23rd transfer of funds from the account # 0599008504482 at Sun Bank in the names of "Donald L. Davenport or Mark Davenport" to account # 0599008505729 at Sun Bank in the names of "Mark Davenport or Don L. Davenport, Jr." constitutes a fraudulent transfer which the trustee can avoid under Missouri law as applicable through Section 544 of the Bankruptcy Code.

Section 544 of the Bankruptcy Code empowers the trustee of a bankrupt's estate to avoid any transfer that state law would allow a hypothetical lien creditor or an actual unsecured creditor to avoid. *In re Sergio, Inc.*, 16 B.R. 898, 908 (Bankr. D.Haw.1981). Missouri statutes proscribe that a debtor's creditors may avoid, as fraudulent, transfers "made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or damands ..." 428.020 Mo.Rev.Stat. (1986). Courts in Missouri understand the difficulty a creditor faces in trying to prove the existence of the intent required by Section 428.020 and have held that a plaintiff may raise the presumption of such an intent by putting on evidence of certain "badges of fraud." *Harmony Unlimited, Inc. v. Chivetta*, 743 S.W.2d 884, 886 (Mo.App.1987). Among the "badges of fraud" Missouri courts recognize are:

(1) a conveyance to a spouse or near relatives; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfer in anticipation of suit or execution; (5) insolvency caused by the transfer; (6) transfer of all or substantially all of the debtor's property; (7) retention of possession by the debtor; and (8) [the defendant's] failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

743 S.W.2d at 886. (citing *Community Federal Savings and Loan Assoc. v. Boyer*, 710 S.W.2d 332 (Mo.App.1986)). A creditor need not prove that all the "badges of fraud" exist to raise the presumption that the defendant possessed a fraudulent intent. 743 S.W.2d at 886. Many of the "badges of fraud" are present in the case at bar. First, the transfer was from the debtor to close relatives of his, namely, his sons. Second, no consideration supported the transfer. Third, the transfer occurred during the pendency of Landmark Bank's lawsuit against Davenport. Fourth, the transfer involved a very substantial portion of Davenport's property, at a time when he was spending his remaining liquid assets at a rate of $10,000.00 to $27,000.00 per month. Fifth, the transfer probably rendered Davenport insolvent. Sixth, Davenport retained control akin to possession of the funds following the transfer. Seventh, and finally, Davenport failed to produce evidence sufficient to rebut the presumption of a fraudulent intent in that the court has found that his explanation for the transfer as a gift and manifestation of his longstanding desire to impart financial security upon his sons lacks credibility. The court finds that Donald L. Davenport consummated the March 23rd transfer in an attempt to defeat the rights of his creditors and because the transfer would be avoidable as a fraudulent transfer under Missouri law, the trustee may avoid it pursuant to Section 544 of the Bankruptcy Code.

The trustee has not only sought to avoid the March 23rd transfer but has, as noted above, asked the court, in Count VIII of his First Amended Adversary Complaint, to enter a judgement, under Section 550(a), against the Defendants for the money value of the transfer.[7] A court applying Section 550 may exercise discretion in choosing whether to order the return of the property involved in the avoidable transfer to the estate or to enter a money judgement for the value of the transferred property against the parties on whom the section imposes liability. *In re Da–Sota Elevator Co.*, 939 F.2d 654, 655 n. 2 (8th

---

7. NDS, though a named defendant in this adversary proceeding, is no longer a functioning business, having sold substantially all its assets to Mexico Plastics Company in 1989. The trustee consented to this sale. All counts of the trustee's First Amended Adversary Complaint against NDS are DISMISSED.

Cir.1991). In this case the funds subject to the March 23rd transfer have been dissipated and lost through an investment of at least $600,000.00 in NDS, $9,800.00 of the funds were spent by Don, Jr. and the balance has been either spent or unaccounted for by Davenport. In such circumstances the entry of a money judgement is proper. *In re Laughlin*, 18 B.R. 778 (Bankr. W.D.Mo.1982), *cf. In re Computer Universe, Inc.*, 58 B.R. 28 (Bankr.M.D.Fla. 1986) (where plaintiff could not be made whole by the return of computer equipment, a judgement for the value of the equipment on the petition date when it was relatively unused was the proper remedy).

Having determined that Section 550(a) entitles the trustee to the entry of a judgement for the money value of the funds subject to the March 23rd transfer, the court must determine, under Section 550, against whom to enter such a judgement. Section 550(a) holds, among others, the initial transferees of the subject matter of the avoided transaction liable for the return of the property or its value. 11 U.S.C. § 550(a). The Davenport sons, Mark and Don, Jr., were the initial transferees of the funds subject to the March 23rd transfer.

 A court applying section 550 should consider whether the imposition of liability upon one who seemingly fits within the language of the section generates an equitable result. *In re Colombian Coffee Co.*, 75 B.R. 177 (S.D.Fla.1987). The district court in *Colombian Coffee*, held that the bankruptcy court properly exercised its equitable powers in opting not to impose liability upon a bank under section 550 where, though the bank qualified as the "initial transferee" of fraudulently transferred funds, it functioned only as a conduit through which the wire transfers which comprised the fraudulent transfer passed. *Id.* at 180. Likewise, in *In re C–L Cartage Co.*, 70 B.R. 928 (Bankr.E.D.Tenn. 1987), the court exercised its equitable powers and refused to read sections 547(b)(4)(A) and 550(a) of the Bankruptcy Code literally to hold a bank liable for preferential transfers to insiders made more than 90 days before filing and less than one year before filing, though the court noted that a literal reading of those provisions of the Code would support an imposition of liability upon the bank. *Id.* at 933–34. The facts in this case demonstrate that Donald L. Davenport retained control over the funds subject to the March 23rd transfer, that he freely utilized his sons' signature stamps to access the money and that he ultimately diverted the money back to himself for personal use, or to NDS, the corporation whom he served as both president and a member of its board. In these circumstances the court finds that applying Section 550(a) to impose liability upon Mark Davenport who exercised no control over the funds at issue generates an inequitable result. The court, therefore, refuses to grant trustee's request in Count VIII of his First Amended Adversary Complaint, for a money judgement against Mark Davenport.

 Don, Jr.'s circumstances differ slightly from his brother's. The evidence presented to the court demonstrated that after the first meeting of creditors in this case but before the entry of the court's temporary restraining order, Don, Jr. twice withdrew money from the Mark Twain account in his and his brother's name containing funds traceable to the March 23rd transfer. The funds Don, Jr. withdrew totalled $16,800.00. The evidence showed Don, Jr. used $9,800.00 of these funds on a personal vacation but failed to explain his use of the other $7,000.00. The court holds that it would be inequitable to hold Don, Jr. liable under Section 550(a) for more than the $16,800.00 over which he exhibited control. In resolution of the trustee's claims against Don, Jr. under Count VIII of his First Amended Adversary Complaint, the court will enter a money judgement against Don, Jr. in the amount of $16,800.00.

The trustee, in Count IV of his First Amended Adversary Complaint, asked the court to impose a constructive trust on the NDS stock and notes the Debtors' sons purchased with $600,000.00 of the $949,-329.79 transferred on March 23, 1987. While the court believes the imposition of a money judgment against Mark Davenport or such a judgment in excess of $16,800.00

against Don, Jr. would lead to an inequitable result, no such inequity would flow from an order of this court requiring the sons to turnover their NDS stock and notes over to the estate. The court, pursuant to its powers under § 550(a) orders the sons, Donald L. Davenport, Jr. and Mark Davenport, to turnover to the estate their NDS stock and notes purchased with $600,000.00 of the funds transferred to their Sun Bank account on March 23, 1987.

■ The language of Section 550(a) does not empower a court to enter judgement against the transferor of property that was the subject matter of a transfer that the trustee later avoids.[8] However, the trustee asserts that Section 550(a) permits the entry of a judgement against Donald L. Davenport on either of two other grounds. First, he alleges, without explanation, that the March 23rd transfer was for Davenport's benefit and that he is therefore liable under section 550(a). Second, the trustee claims that Section 550(a) imposes liability upon Davenport as a subsequent transferee of the funds by virtue of the control he exerted as the president and member of the board of directors of NDS, the ultimate recipient of $600,000.00 of the funds transferred on March 23, 1987. The court agrees that Davenport was a party for whose benefit the March 23rd transfer was made which subjects him to liability under Section 550(a). Davenport benefitted from the March 23rd transaction in two ways. First, as the trustee points out, he, as a board member and president, controlled NDS and drew a salary from NDS. Hence, Davenport benefitted when NDS received the proceeds of the transfer by way of his sons' loans to and equity purchases in NDS. Second, Davenport benefitted from the transfer in that he retained control of the funds and freely utilized them by writing checks on the accounts (first at Sun Bank and later at Mark Twain Bank) which held the proceeds of the March 23rd transfer. The entry of a money judgement against Donald L. Davenport for the amount of the March 23rd transfer will not offend equity. Therefore, the court will award to the trustee the relief he seeks against Donald L. Davenport in Count VIII of his First Amended Adversary Complaint by entering a judgement against him for the amount of $939,329.79.[9]

An Order consistent with this Memorandum Opinion will be entered this date.

## ORDER

For reasons set forth in the Memorandum Opinion filed herewith, it is

ORDERED that

(1) All Counts of the trustee's First Amended Adversary Complaint which pertain to Mary J. Davenport are DISMISSED;

(2) All Counts of the trustee's First Amended Adversary Complaint which pertain to Mark Davenport are DISMISSED except as provided in paragraph (6) herein;

(3) All Counts of the trustee's First Amended Adversary Complaint which pertain to NDS Plastics, Inc. are DISMISSED;

(4) A judgment is granted in favor of the trustee and against Donald L. Davenport, Sr. in the amount of $939,329.79;

(5) A judgment is granted in favor of the trustee and against Donald L. Davenport, Jr. in the amount of $16,800.00;[1] and

---

8. The Bankruptcy Court for the Eastern District of New York has held a party liable under § 550(a) based upon his status "as an initial transferor" in a fraudulent transaction. *In re Carousel Candy Co.*, 38 B.R. 927, 938 (Bankr. E.D.N.Y.1984). The court explained its decision saying, "[a]n action for fraudulent transfer lies against the transferor, and initial, immediate or mediate transferees, or the beneficiaries of such transfers—all persons in whose hands the assets of the debtor come to res [sic]." *Id.* at 937.

9. The court emphasizes that it dismissed all counts of the trustee's First Amended Adversary Complaint as they apply to Mary J. Davenport and that the money judgement here awarded runs only against Donald L. Davenport.

1. One can trace the $16,800.00 Don, Jr. spent to the funds fraudulently transferred on March 23, 1987. The court reminds the trustee that though it has entered judgments against both Donald L. Davenport (Debtor) and Donald L. Davenport, Jr., Section 550(c) limits the trustee to a single recovery in the amount of $939,329.79. 11 U.S.C. § 550(c).

(6) Donald L. Davenport, Jr. and Mark Davenport shall turnover to the trustee all notes and shares of NDS Plastics, Inc. stock which were purchased with $600,-000.00 of the funds transferred to their Sun Bank account on March 23, 1987.